**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
Facsimile: (917) 463-1044
jpafiti@pomlaw.com

*Attorney for Plaintiffs*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE YAYYO, INC. SECURITIES LITIGATION | Case No. 2:20-cv-08235-SVW-AFM<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>JURY TRIAL DEMANDED |

## TABLE OF CONTENTS

Page

I.   NATURE OF THE ACTION ..................................................................... 1

II.  JURISDICTION AND VENUE ................................................................ 6

III. PARTIES ................................................................................................... 8

IV.  SUBSTANTIVE ALLEGATIONS ........................................................ 11

    A.   Background ...................................................................................... 11

    B.   El-Batrawi and his Checkered Past ............................................... 14

    C.   YayYo Over-Extends Pre-IPO ....................................................... 19

    D.   The Company Launches and the Lawsuits Begin, Revealing the Truth ..... 20

        1.   The Declaratory Judgment Action Against El-Batrawi .................. 21

        2.   The SRAX Action ........................................................................... 27

        3.   The Davis Action ............................................................................ 28

        4.   The Company Undergoes More Changes and Needs More Funding ..... 31

        5.   The FirstFire Global Lawsuit ......................................................... 32

    E.   Other Developments Materially Impact the Company .................. 34

    F.   Defendants Use Material Misstatements and Omissions in the Registration Statement to Sell YayYo Shares to Public Investors ............ 38

        1.   Material Misstatements and Omissions Regarding Mr. El-Batrawi's Role and Stock Ownership ......................................... 39

        2.   Material Misstatements and Omissions Regarding Internal Controls ......................................................................................... 43

        3.   Material Misstatements and Omissions Regarding Use of IPO Proceeds ..................................................................................... 44

        4.   Material Misstatements and Omissions Regarding the Debt to SRAX ......................................................................................... 46

i

5.    Material Misstatements and Omissions Regarding Payment to Davis ...................................................................................... 47

6.    The Registration Statement Failed to Disclose Trends, Uncertainties and Risks Regarding YayYo's Products ................... 48

SECURITIES ACT COUNTS ........................................................................ 51

V.    COUNT I
(Violations of Section 11 of the Securities Act Against All Defendants) ............ 52

VI.   COUNT II
(Violations of Section 12(a)(2) of the Securities Act Against the Underwriter Defendants) .............................................................................................. 53

VII.  COUNT III
(Violations of Section 15 of the Securities Act Against All Defendants) ............ 55

VIII. ADDITIONAL ALLEGATIONS APPLICABLE ONLY TO EXCHANGE ACT CLAIMS ............................................................................................. 56

A.    Additional Misrepresentations and Omissions ............................ 57

B.    Scienter .................................................................................... 61

C.    Loss Causation ......................................................................... 62

D.    Presumption of Reliance ........................................................... 63

EXCHANGE ACT COUNTS ........................................................................ 64

IX.   COUNT III  (Violations of § 10(b) of the Exchange Act Against the Individual Defendants and YayYo) ............................................................ 64

X.    COUNT IV
(Violations of § 20(a) of the Exchange Act Against the Individual Defendants) . 65

XI.   PLAINTIFFS' CLASS ACTION ALLEGATIONS .............................. 66

XII.  PRAYER FOR RELIEF ......................................................................... 68

XIII. JURY TRIAL DEMANDED .................................................................. 69

ii

Lead Plaintiff Bernard Bednarz and Plaintiff William Koch ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, announcements, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Rideshare Rental, Inc., which was previously known as YayYo, Inc. ("YayYo" or the "Company"), and information readily obtainable on the Internet.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired YayYo common stock pursuant and/or traceable to the registration statement and related prospectuses (collectively, the "Registration Statement") issued in connection with YayYo's November 13, 2019 initial public offering (the "IPO" or "Offering"), seeking to recover compensable damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act") (the "Securities Act Class"); and (2) purchased or otherwise acquired YayYo stock during the period from November 13, 2019

through and including April 28, 2020, seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 (the "Exchange Act Class," together with the Securities Act Class, the "Classes").

2.    YayYo is a company that rents cars to people who want to be rideshare drivers (primary for Uber or Lyft) but do not own their own cars or would prefer to use a rental car when driving paid passengers.

3.    On April 30, 2018, YayYo filed a registration statement with the SEC on Form S-1, which in combination with subsequent amendments on Forms S-1/A and filed pursuant to Rule 424(b)(4), are collectively referred to herein as the Registration Statement, which was issued in connection with the IPO.

4.    On November 14, 2019, YayYo filed with the SEC a prospectus for the IPO of common stock on Form 424B4, which forms part of the Registration Statement. In the IPO, YayYo sold 2,625,000 shares of its common stock at $4.00 per share, and purportedly the "[t]otal gross proceeds from the offering were $10,500,000[.]"

5.    YayYo was founded and run by Defendant Ramy El-Batrawi, a man with a colorful history that included being charged with securities fraud by the SEC. In connection with the 2010 voluntary settlement of the charges set forth in a 2006 SEC case, El-Batrawi was prohibited from acting as an officer or director of a public company for a period of five years following the date of entry of the final judgment by consent.

6.      NASDAQ representatives looked at El-Batrawi's questionable past and required his removal prior to listing—he was no longer to hold any positions of control with the Company or own more than 10% of it.  According to the Registration Statement, he resigned as CEO and from the Board of Directors (the "Board").  The Registration Statement also stated that he had sold the required amount of shares.

7.      The Registration Statement also reported a debt of $334,471 to the social media company Social Reality, Inc. and did not disclose any funds owed to former CEO Anthony Davis.  The funds raised in the IPO were purportedly to be used primarily to purchase vehicles for the service.

8.      However, shortly after the IPO in November 2019, a number of newly filed lawsuits disclosed the truth: the Company's insufficient internal controls and failure to control El-Batrawi had led to a Company with unpaid obligations, broken promises and an inability to continue as a NASDAQ company.

9.      First came a lawsuit from the Company itself.  YayYo filed suit against El-Batrawi.  On January 24, 2020, the Company filed an action for declaratory judgement and permanent injunction against El-Batrawi in the Superior Court of the State of California, County of Los Angeles, alleging that El-Batrawi continued to purport to act on behalf of the Company and he was harming the business.  Notably, the complaint in the action stated this behavior had started prior to the IPO, though it was not disclosed in the Registration Statement.

10.     Additionally, the lawsuit alleged that El-Batrawi had never sold his stock in the Company as the Registration Statement had represented.

11.     A couple of days later, then-CEO, Defendant Jonathan Rosen, who had submitted a declaration in conjunction with the action against El-Batrawi, resigned.  He claimed "good cause" in his resignation letter.

12.     On February 10, 2010, after the market closed, the Company announced its intention to voluntarily delist from the NASDAQ.  The Company spun it as a good thing, noting: "The voluntary delisting will permit the Company to operate its business free from restrictions imposed by NASDAQ rules and the conditions applicable to the listing of the Company's common stock on the NASDAQ."  However, the Company also admitted that, while the delisting was voluntary, it came after NASDAQ officials reported a belief that the Company failed to adhere to NASDAQ's rules.

13.     On February 11, 2020, a social media company YayYo employed, Social Reality, Inc. ("SRAX"), filed a lawsuit against YayYo alleging breach of contract and unjust enrichment.  The Registration Statement only reported debts owed to SRAX at the end of 2018, and therefore omitted the tab amassed in 2019, which was an extra $91,815 for a total of $426,286.

14.     Additionally, prior to the IPO, SRAX had sold its YayYo debt to a third party that YayYo was to pay.  YayYo never paid and therefore SRAX had to, adding $219,000 to YayYo's bill to SRAX.  In total, SRAX is seeking $645,286 in damages.  The

4

Registration Statement only disclosed that YayYo owed $334,471 for the year ending 2018.

15.     The market knew just how bad the delisting and the SRAX Action were – the stock went from trading at over $1 to closing at $0.39 on February 11, 2010, declining a staggering 64% from the prior day.

16.     On March 3, 2020, former YayYo President, CEO, and Director Davis filed a complaint for damages, declaratory relief, failure to pay wages in violation of labor code 201, et. seq., violation of California's Unfair Competition Laws (Business & Professions Code § 17200, et seq.), breach of contract, intentional misrepresentation and fraud, and promissory fraud against YayYo seeking a minimum of $454,086.39.   Davis makes numerous allegations in the suit, including that YayYo filed false documents with the SEC related to his compensation.

17.     That same day, the Company, which was now trading over-the-counter, announced that El-Batrawi was back in charge.   According to the announcement, El-Batrawi would be operating as CEO and a member of the Board effective immediately.

18.     On April 28, 2020, FirstFire Global Opportunities Fund, LLC, which purported to have obtained shares as part of the underwriting, filed a lawsuit.   That suit alleges, among other things:

- the Registration Statement used to conduct the IPO was materially false and misleading because it concealed El-Batrawi's ongoing control over the

5

company and its IPO process;

- the announcement that the IPO was "closed" was false and misleading because when the underwriters for the IPO were unable to raise the full $10 million required by NASDAQ to close the IPO, El-Batrawi fabricated a $1.2 million commitment from a trust operated by an old friend of El-Batrawi, who later claimed he had never committed to pay the money; and

- Defendants solicited creditors and shareholders to invest more money to close the IPO, and "sought to sweeten the attraction of such further investment" by agreeing that YayYo would "immediately" pay them back from the IPO proceeds, although there was no mention of these debts in the Registration Statement.

19.     At the commencement of this action, the Company's common stock continued to trade significantly below the IPO price.  As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other members of the Classes have suffered significant losses and damages.

## II.        JURISDICTION AND VENUE

20.     The claims asserted herein arise under Sections 11, 12(a) and 15 of the Securities Act (15 U.S.C. §§ 77k, 77I(a) and 77(o)) and under Sections 10(b) and 20(a) of

6

the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 1337, Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v).

22.     This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  The Company is also headquartered in this District.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)) as a significant portion of the Defendants' actions, and the subsequent damages took place within this District.

24.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mails, interstate telephone communications and the facilities of a national securities exchange.  Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of YayYo securities in this District.

7

### III.    PARTIES

25.    Plaintiffs purchased the Company's common stock at artificially inflated prices pursuant and/or traceable to the Registration Statement for the Company's IPO and were damaged upon the revelation of the alleged corrective disclosures.

26.    Plaintiff Koch purchased YayYo common stock directly from WestPark (as defined below) as part of the IPO.

27.    Defendant Rideshare Rental, Inc. is a Delaware corporation with its principal executive offices located at 433 N. Camden Drive, Suite 600, Beverly Hills, California 90210.  YayYo securities traded on the NASDAQ exchange from the IPO until February 20, 2020 under the ticker symbol "YAYO."  Following its delisting from the NASDAQ exchange, YayYo securities have traded on the OTC Pink market since February 20, 2020 under the ticker symbol "YAYO."  On November 10, 2020, the Company announced its name change to Rideshare Rental, Inc.  YayYo is a holding company that operates wholly-owned subsidiaries, including Distinct Cars, LLC, Savvy, LLC, Rideyayyo LLC and Rideshare Car Rentals LLC – all Delaware limited liability companies.

28.    El-Batrawi founded YayYo and served as its Chief Executive Officer ("CEO") from the inception of the Company until October 4, 2018, then as Acting CEO from November 17, 2018 to February 1, 2019, and as a member of the Board between November 2016 and September 2019.  Due to his checkered past, at the insistence of the NASDAQ, El-Batrawi purportedly resigned all positions at YayYo in September 2019 so

8

that the Company could be taken public. On March 3, 2020, the Company announced that El-Batrawi had been reappointed CEO of YayYo and as a member of its Board.

29. Defendant Jonathan Rosen ("Rosen") was at the time of the IPO YayYo's CEO. On January 26, 2020, Rosen resigned from his position as CEO.

30. Defendant Kevin F. Pickard ("Pickard") was at the time of the IPO YayYo's Chief Financial Officer, Secretary, and a member of its Board. He resigned on April 3, 2020.

31. Defendant Jeffrey J. Guzy ("Guzy") was a member of the Company's Board at the time of the IPO. According to a Company filing, he was "removed" from the Board effective January 22, 2020.

32. Defendant Christopher Miglino ("Miglino") was a member of the Company's Board at the time of the IPO. According to a Company filing, he was "removed" from the Board effective January 22, 2020. He also serves as CEO of SRAX.

33. Defendant Harbant S. Sidhu ("Sidhu") was a member of the Company's Board at the time of the IPO.

34. Defendant Paul Richter ("Richter") was a member of the Company's Board at the time of the IPO. According to a Company filing, he was "removed" from the Board effective January 22, 2020.

35. Defendants El-Batrawi, Rosen, Pickard, Guzy, Miglino, Sidhu, and Richter are sometimes referred to herein as the "Individual Defendants."

9

36.     Each of the Individual Defendants signed or authorized the signing of the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement, and attended road shows and other promotions to meet with and present favorable information to potential YayYo investors, all motivated by their own and the Company's financial interests.

37.     WestPark Capital, Inc. ("WestPark") is a Colorado corporation, having its principal place of business and principal executive offices located at 1900 Avenue of The Stars, Third Floor, Los Angeles, California 90067.

38.     Aegis Capital Corporation ("Aegis") is a New York corporation, having its principal place of business and principal executive offices located at 810 7th Avenue, 18th Floor, New York, New York 10019.  According to the Registration Statement, Aegis acted as the lead managing underwriter and as representative of the underwriters.

39.     Westpark and Aegis are collectively referred to herein as the "Underwriter Defendants."  Pursuant to the Underwriting Agreement, the Underwriter Defendants were to make $840,000 on the IPO.  According to the Registration Statement:

> Subject to the terms and conditions of an underwriting agreement between us and the Representative, we have agreed to sell to each underwriter named below, and each underwriter named below has severally agreed to purchase, at the public offering price, less the underwriting discounts set forth on the cover page of this prospectus, the number of shares of common stock listed next to its name in the following table:

10

| Underwriter | Number of shares of common stock |
|---|---|
| Aegis Capital Corp. | 1,312,500 |
| WestPark Capital, Inc. | 1,312,500 |
| **Total** | 2,625,500 |

The underwriters are committed to purchase all the shares of common stock offered by this prospectus, if they purchase any shares of common stock. The underwriting agreement also provides that if an underwriter defaults, the purchase commitments of non-defaulting underwriters may be increased, or the offering may be terminated. The underwriters are not obligated to purchase the shares of common stock covered by the underwriters' option to purchase additional shares of common stock described below. The underwriters are offering the shares of common stock, subject to prior sale, when, as and if issued to and accepted by them, subject to approval of legal matters by their counsel, and other conditions contained in the underwriting agreement, such as the receipt by the underwriters of officer's certificates and legal opinions. The underwriters reserve the right to withdraw, cancel or modify offers to the public and to reject orders in whole or in part.

40.     The Underwriter Defendants, YayYo and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background

41.     In June 2016, El-Batrawi incorporated YayYo in Delaware.  The Company first filed an Offering Statement on December 15, 2016.

42.     According to the Registration Statement, the Company completely changed its business model after inception. Until June 30, 2017, the Company was developing a single sign-on metasearch "ridesharing" application for smartphone users that sought to provide price comparison and bookings of available ridesharing and taxi services along

11

with select limousine and other public and/or private transportation services. The Company even hired rapper Master P to make a promotional jingle about the service, *available at* https://youtu.be/pQg6WPlAQWE. The business model required sign-on by companies such as Uber and Lyft.

43.     However, there was trouble early on. An ad featuring a video of John O'Hurley, known for portraying the character J. Peterman on the television show *Seinfeld,* ran on CNBC and Fox News promoting the YayYo IPO. In it, O'Hurley told investors they could make millions if they invested early and to "do it now. Before all the shares are gone." This original ad raised concerns. According to an article on Business Insider from May 11, 2017:

> [W]hile YayYo aggressively solicits investors on TV, the company's products are far from ready, and some of his claims don't seem to stand up. Launching the aggregator service is dependent on securing agreements with companies such as Uber and Lyft so that it can integrate those services' prices and available cars into the YayYo app. El-Batrawi said in one conversation that those deals were on the way. YayYo is in 'contact' with Uber and it has an 'agreement' with Lyft, he said. Uber and Lyft deny this.

> "We sent YayYo a cease-and-desist letter several weeks ago and have suspended their access to Lyft," Adrian Durbin, a Lyft spokesman, told Business Insider. "I think it's fair to say that their CEO's characterization of our relationship is wildly inaccurate."

44.     The same article said that, as of that point, 700 people had already privately invested in the Company.

45.     Eventually, when Uber and Lyft refused to sign on, the Company had to change course.

12

46.     On August 12, 2017, the Company announced it was shifting its primary corporate focus.  According to the Registration Statement:

> As of the date of this Prospectus, the Company's operating business segments include (i) an online peer-to-peer bookings platform to service the ridesharing economy through Rideshare (the "Rideshare Platform"), and (ii) the maintenance of a fleet of standard passenger vehicles to be made commercially available for rent through Distinct Cars ("Fleet Management"). Through the Company's wholly-owned subsidiaries Rideshare and Distinct Cars, the Company seeks to become the leading provider of a standard rental vehicle to drivers in the ridesharing economy.

47.     In other words, if people want to drive for Uber, Lyft or another rideshare company and do not have their own car, or would prefer not to use their own car, they can go to YayYo.

48.     Prior to the Company going public, it operated a website at yayyoipo.com ("IPO Website") for what it first called "Conditional IPO Orders," in February 2019, and then called "Indications for the YayYo, Inc. IPO," on November 1, 2019, shortly before the Company went public.[1]

49.     The IPO Website featured a video of O'Hurley[2] again.  This time he stated:

> You ever heard of Uber and Lyft? Of course you have. They are called disruptive companies because they changed the way we do things. Well here is another Company called YayYo, which is also a disrupter.  YayYo empowers and supplies disruptive companies.  You know in its day gold mining was disruptive and the people that really made the money in the gold rush were the people that supplied the picks and the shovels.  And ridesharing is the wave of the future.  YayYo empowers ridesharing by offering a fleet of cars to drivers.  YayYo bridges the gap between the driver

---

[1] Versions of the website as it existed at these periods can be accessed through the Internet Archive WayBackMachine at http://web.archive.org/web/2020*/https://yayyoipo.com/.

[2] Company filings list O'Hurley as a shareholder of YayYo.

and the rideshare company, whose brand depends on attracting and retaining quality drivers.  And, in addition to managing this rideshare fleet, YayYo is developing other services and technologies that make it scaled for growth.  And because of YayYo's business model, YayYo can expand faster than other businesses because they empower hyper-growth tech businesses.

50.     On April 30, 2018, YayYo filed a registration statement on Form S-1 with the SEC.  The SEC sent the Company a series of correspondence about the registration statement and it required fifteen amendments before it was declared effective on November 12, 2019.

**B.      El-Batrawi and his Checkered Past**

51.     According to the website Forbes400list.com, which is not operated by Forbes Media LLC, El-Batrawi amassed a "net worth of over $50 million by the age of 23." As per the website:

> A student of Napoleon Hill's legendary self-improvement book, Think and Grow Rich since the age of 12, Ramy knew that when he formed a burning desire to reach a goal, and maintained his faith in reaching that objective, nothing could stand in his way. As Napoleon Hill maintained: "Whatever the mind can conceive and believe, it can achieve."

> Ramy worked with Adman Khashoggi, who was seemingly impossible to reach, Khashoggi brokered deals between the Saudi government and US defense contractors like Lockheed, Raytheon, Grumman, and Northrup. Nevertheless, exploiting the influence of Khasoggi's inner circle, Ramy ended up becoming one of the Saudi billionaire's closest associates and closed transactions all around the world.

> Close business associations with other billionaires such as Carl Icahn and Donald Trump followed.

14

When Ramy ventured into media in the 1990s, an astonishing success in the history of publishing followed. Once he launched a media campaign for John Gray's "Men Are From Mars, Women Are From Venus," sales skyrocketed, causing the book about male and female relationships to sell more than 50 million copies. The book spent 121 weeks on the bestseller lists.

52.     El-Batrawi founded YayYo.  He was also the majority shareholder, chief executive officer and a director of YayYo when the Company first filed an Offering Statement with the SEC in 2016.

53.     However, there was a problem.  On April 13, 2006, El-Batrawi was named, along with other officers, directors, and/or associates of Genesis Intermedia, Inc., as defendants in an SEC enforcement action.  In the SEC's complaint filed in *SEC v. El-Batrawi, et al.*, Case No. 2:06-cv-02247-CAS-VBK (C.D. Cal.), it charged El-Batrawi with violations of Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Securities and Exchange Act of 1934, in connection with a stock loan and manipulation scheme.  The SEC enforcement action alleged, among other things, that the defendants had violated antifraud provisions of federal securities laws by orchestrating a scheme to manipulate the stock price of Genesis Intermedia, Inc., a now-defunct public company that was also based in California.  It also alleged that El-Batrawi was secretly compensating a television commentator to hype Genesis.  On April 1, 2010, El-Batrawi settled the SEC enforcement action by entering into a final judgment by consent with the SEC.  In connection with the settlement of the SEC enforcement action charges, the U.S. District Court for the Central District of California entered a consent decree against El-Batrawi,

15

which, among other things, barred him from acting as an officer or director of a public company for a period of five years following the date of entry of the final judgment by consent.

54.    In 2014, El-Batrawi was also sued by investors alleging that he misled them about an investment in a multilevel-marketing company that El-Batrawi controlled called Xerveo, which sold diet products.  The case was later settled.

55.    As Defendants prepared to take YayYo public in the IPO, NASDAQ conditioned its listing on El-Batrawi resigning from his positions at YayYo and retaining less than 10% ownership interest in YayYo.  The Registration Statement stated El-Batrawi had stepped away from the Company and, due to a sale to four existing shareholders, his controlled entity would hold only 9.9% of shares outstanding.

56.    According to the Registration Statement:

On October 4, 2018, Mr. El-Batrawi resigned as Chief Executive Officer. He then was appointed Acting Chief Executive Officer on November 17, 2018. On February 1, 2019, Mr. El-Batrawi resigned from his position as Acting Chief Executive Officer of the Company upon the appointment of Jonathan Rosen as Chief Executive Officer. Mr. El-Batrawi resigned as our director effective as of September 1, 2019.

57.    The Registration Statement also stated that the resignation was a condition for the Company being approved for listing on NASDAQ:  "Mr. El-Batrawi, the founder and original Chairman of the Board and original Chief Executive Officer of the Company from its incorporation of the Company, resigned from all positions with the Company as a condition for being approved for listing on The Nasdaq Capital Market."

16

58.     According to the Registration Statement:

Mr. El-Batrawi has entered into a Voting Trust Agreement (the "Trust") pursuant to which the voting power of all of his outstanding common stock will be controlled by a trustee who will use the voting power of the common stock held in the Trust to vote on all matters presented for a vote of stockholders in the same proportion that the shares of common stock not subject to the Trust voted on such matters. The Trust shall be irrevocable, and shall terminate upon the earlier of (a) the written agreement of the Company, the trustee and a duly authorized representative of NASDAQ, or (b) the date upon which the Company is not listed on a security exchange controlled by NASDAQ.

59.     After taking into account the Trust, the Company still had a significant amount of voting shares controlled by large pre-IPO investors.   According to the Registration Statement:

As of the date of this prospectus, the Gray Mars Venus Trust, of which John Gray is the beneficial owner, owns approximately 38.5% of our outstanding shares of common stock. Taking into account the effect of the Trust on voting power, the Gray Mars Venus Trust will control, after this offering approximately 35.1% of the Company's voting stock and have a significant ability to influence corporate matters, including the election of directors, any merger, consolidation or other major corporate transaction requiring stockholder approval, which may negatively impact your liquidity and/or your gain on your investment.  In addition to the stock controlled by John Gray, five other individuals or entities will own 39.3% of our common stock after the completion of this offering, which further concentrates the influence on corporate matters among a few shareholders.

(John Gray is the same John Gray of "Men are from Mars, Women are from Venus" fame.)

60.     The Registration Statement also detailed El-Batrawi's purported sale of most of his shares:

As a condition to approving the Company's common stock for listing on The NASDAQ Capital Market, X, LLC, an entity that is wholly-owned and

17

controlled by Ramy El-Batrawi, our founder and former Chief Executive Officer and former director, agreed to sell 12,525,000 of its 15,425,000 shares of common stock. The 12,525,000 shares (the "Private Shares") were sold pursuant to an exemption from registration to four existing Company shareholders who qualify as accredited investors (as that term is defined in Securities Act Rule 501(a)). The Private Shares were sold at $3.00 per share in exchange for non-recourse, non-interest-bearing promissory notes with maturities ranging from one year to eighteen months. As a result of the sale, X, LLC's beneficial ownership shall be reduced to 9.9% of the shares outstanding after the completion of this Offering.

61.     Defendant Rosen, who had been hired by the Company in February 2019, was appointed CEO in October 2019, purportedly replacing El-Batrawi in that role. According to the Registration Statement, Rosen had "more than 25 years' experience serving as an executive driving revenue, operations and marketing for leading public and private companies."

62.     The Registration Statement also mentioned a prior executive, Anthony Davis, who was the Company's former president, chief executive officer and a director. According to the Registration Statement:

On November 29, 2016, the Company and Mr. Davis, a former executive officer of the Company, entered into an offer of employment agreement with the Company setting forth an initial base salary for Mr. Davis's first three months of service and performance under his term of employment with the Company. As set forth under the employment offer, Mr. Davis was entitled to receive (i) $15,000 for his service in the month of December 2016, (ii) $10,000 for service performed during the month of January, 2017 and an additional $10,000 for service performed by Mr. Davis during the month of February 2017." The Registration Statement stated that Davis had failed to exercise stock options granted to him, and therefore they expired December 31, 2018.

18

63.     The Registration Statement stated that approximately $5,000,000 of the funds raised from the IPO were to be used to add to the Company's fleet of passenger vehicles with $2,400,000 for repayment of notes payable, $700,000 for sales and marketing and $693,800 for working capital and general corporate purposes.

## C.     YayYo Over-Extends Pre-IPO

64.     YayYo spent considerable sums on marketing and advertising, as represented by the pre-IPO television ad.

65.     The Registration Statement reported:

During the year ended December 31, 2018, the Company incurred $334,471 for advertising and digital media services from Social Reality, Inc. The advertising fees for the year ended December 31, 2018, were less than 5% of Social Reality, Inc.'s consolidated gross revenues. One of our directors, Christopher Miglino, is the Chief Executive Officer of Social Reality, Inc. and owns approximately 7.5% of Social Reality Inc.'s stock. At December 31, 2018, the Company had an amount due of $334,471 to Social Reality, Inc. The transactions with Social Reality, Inc. were arm's length transactions in the ordinary course of business upon terms no less favorable than the Company could obtain from third parties.

66.     The Company also entered into a series of promissory notes pre-IPO.  As of December 31, 2018, the Company reported outstanding indebtedness, excluding capital leases, of approximately a total of $2,690,181. That included: (i) $790,000 in unsecured notes payable to an investor; (ii) $319,667 in unsecured notes payable to an investor; (iii) $222,222 in unsecured notes payable to an investor; (iv) $1,296,018 in a secured note payable due the earlier of August 31, 2019 and (v) $62,274 in unsecured notes payable/line

19

of credit to a merchant banks.  The Company also specifically reported it had a balance of $880,000 on a 2017 promissory note it issued to John Gray.

**D.      The Company Launches and the Lawsuits Begin, Revealing the Truth**

67.    The Company's stock began trading publicly on November 13, 2019.

68.    On November 15, 2019 (the "November Closing Release"), YayYo announced that it closed its initial public offering of 2,625,000 common shares at $4.00 per share.  The release stated that gross proceeds from the offering were $10,500,000, before deducting underwriting discounts and commissions and other offering expenses.

69.    From November 13, 2019 to December 18, 2019, the Gray Mars Venus Trust filed forms with the SEC reporting a purchase of 325,000 shares and sales of 329,00 shares.  David Haley, another over 10% shareholder, similarly purchased 125,000 shares but sold 270,000 within the first month of the Company being listed.

70.    On January 6, 2020, YayYo announced it had appointed a new president, Boyd Bishop, to join Rosen.  The press release stated: "Mr. Bishop will take on a senior strategic and operational role and will be key to optimization of the company's ambitious plan to lead the field in delivery of innovative mobility solutions to the massive and growing gig-economy. Bishop joins YayYo's Chief Executive Jon Rosen, another large scale Internet and Automotive Industry executive who held prior, senior roles at Autobytel (now Autoweb) and AOL/Time Warner among others."

71.    On January 13, 2020, YayYo filed with the SEC a Form 8-K announcing that "[o]n January 10, 2020, YayYo Inc. [] entered into an Executive Employment Agreement [] with the Company's Chief Executive Officer, Jonathan Rosen, pursuant to which Mr. Rosen will continue to serve as the Company's Chief Executive Officer for one year or until terminated in accordance with the Agreement."    The Company purportedly previously had an oral agreement with Rosen.

### 1.    The Declaratory Judgment Action Against El-Batrawi

72.    On January 24, 2020, YayYo took the extraordinary step of filing an action for declaratory judgement and permanent injunction against its founder, El-Batrawi, in the Superior Court of the State of California, County of Los Angeles, Case No. 20STCP00309 (the "El-Batrawi Action").

73.    The El-Batrawi Action alleges in pertinent part:

> ***Despite leaving the Company following concerns from NASDAQ regarding his involvement in the day-to-day operations of YayYo in September 2019, Defendant [El-Batrawi] has engaged in a continuous course of actions misrepresenting himself as affiliated with, speaking on behalf of, and authorized or empowered by YayYo. In so doing, Defendant [El-Batrawi] has purported to bind the Company to contracts, direct its employees, change its website, and even attempted to sell the Company to its competitors.***

(Emphasis added.)

74.    The El-Batrawi Action alleged El-Batrawi had "engaged in [] wrongful acts against YayYo to disrupt and harm YayYo's business."

75.    It sought an order prohibiting El-Batrawi from:

21

(a)     Holding himself out as an officer or director of YayYo, Inc.;

(b)     Contacting, or interfering with YayYo's relationships with, its vendors, investors, contractors, prospective business partners and/or agents;

(c)     Purporting to take any corporate action on behalf of YayYo;

(d)     Selling, transferring, assigning hypothecating, encumbering or destroying in any way any assets of YayYo; and

(e)     Destroying, interfering with, accessing, changing, disrupting or taking any action with respect to YayYo's website, i.e., www.yayyo.com

76.     The El-Batrawi Action stated in substance that El-Batrawi was behaving as if his purported resignations were not operative.  In a declaration filed with YayYo's complaint in support of a temporary restraining order (the "Rosen Declaration"), Rosen testified that despite having promised in September 2019 in connection with his resignation to have "***no formal or informal affiliation between the Company and [El-Batrawi]***, expect [*sic*] for [his] minority ownership (less than 10%) in the Company" (emphasis in original), "[El-Batrawi] [had] continue[d] to operate and hold himself out as if a director or officer of YayYo, or as an otherwise authorized representative of the same." Rosen further testified that despite the Registration Statement having expressly stated that El-Batrawi had already sold the 12,525,000 shares of YayYo prior to the IPO, in reality "Defendant El-Batrawi ha[d] failed and/or refused to sell his shares of stock in the Company . . . ."

77.     In the Rosen Declaration, Rosen testified that El-Batrawi had purported to relinquish all formal and informal association with the Company in September 2019.

However, El-Batrawi had continued to attempt to direct YayYo employees and bind the Company. Rosen testified that El-Batrawi was "engag[ing] in a continuous and escalating pattern of behavior destructive to YayYo[.]" Notably, according to the Rosen Declaration, this behavior had been going on since El-Batrawi "resigned," in other words, it had been ongoing when the Company filed its IPO. However, the Registration Statement reported El-Batrawi had left the Company.

78.     Rosen testified that El-Batrawi's misconduct between September 2019 and January 2020 had included, among other things, contacting competitors, suppliers, and vendors of YayYo and negotiating with them as a representative of YayYo; meeting with financiers and investment firms about investing in YayYo and claiming to represent YayYo; hiring a public relations firm for YayYo and producing and airing commercials for YayYo on the *Fox Business Channel*; attempting to hire two marketing firms for YayYo; and directing that changes be made to YayYo's website.

79.     On January 27, 2020—three days after this lawsuit was filed—YayYo filed a Form 8-K with the SEC announcing that Rosen was no longer the CEO of YayYo. It also announced Defendants Guzy, Miglino, and Richter had been replaced as Board members after being "removed" from their positions. The 8-K stated in pertinent part:

> By the written consent of the holders of more than a majority of the shares of YayYo, Inc. (the "Company") then entitled to vote at an election of directors, **_Messrs. Jeffrey J. Guzy, Christopher Miglino and Paul Richter were removed as directors of the Company, effective January 22, 2020_**. On January 24, 2020, the remaining directors of the Company elected Douglas M. Mox, John P. O'Neill and Stephen M. Sanchez as directors to fill such

23

vacancies, each to hold office until the earlier of the expiration of the term of office of the director whom he has replaced, a successor is duly elected and qualified or the earlier of such director's death, resignation, disqualification or removal. Stephen M. Sanchez was elected as the Chairman of the Board of Directors (the "Board").

\* \* \*

In addition to the above, ***on January 26, 2020, Jonathan Rosen resigned from his position as the Company's Chief Executive Officer. Mr. Rosen informed the Board that his resignation was for "Good Reason,"*** as that term is defined in Mr. Rosen's employment agreement with the Company dated January 10, 2020. The Company disagrees with Mr. Rosen's characterization of the circumstances surrounding his resignation and does not believe that "Good Reason" exists for Mr. Rosen's resignation.

(Emphases added.)

80. Under Rosen's employment agreement, which was filed with the SEC:

***"Good Reason" shall mean that any one of the following events*** occurs during the Executive's employment with the Company without Executive's consent: (i) any involuntary reduction of Executive's annual base salary (including earned or granted bonus) by more than 5%; (ii) any material reduction in the package of benefits and incentives provided to the Executive, or any action by the Company which would materially and adversely affect the Executive's participation or reduce the Executive's benefits under any such plans, except to the extent that such benefits and incentives of all other officers of the Company are similarly reduced; ***(iii) any material change in Executive's position or responsibilities, excluding for this purpose an isolated, insubstantial and inadvertent action not taken in bad faith that is remedied by the Company promptly after notice thereof is given by Executive***; (iv) the Company's requiring Executive to relocate to any place outside of a twenty-five (25) mile driving distance of Executive's current work site unless the new work location is closer to the Executive's home or Executive accepts such relocation opportunity; (v) any failure to pay Executive any compensation or benefits to which Executive is entitled within thirty (30) days of the date due; or (vi) any material breach of this Agreement by the Company other than as otherwise specified in this paragraph, including, without limitation. Executive may terminate his or her

employment for Good Reason so long as Executive tenders his resignation to the Company within 90 days after the occurrence of the event which forms the basis for his resignation for Good Reason. Executive shall provide written notice to the Company describing the nature of the event which forms the basis for Executive's resignation for Good Reason, and the Company shall thereafter have ten (10) days to cure such event. In the event that the Executive resigns for Good Reason at a date that is following the Effective Date, the Company shall pay to Executive severance pay (less applicable tax withholdings) an amount equal to six month's Base Salary paid monthly in accordance with the Company's then current payroll practices.

(Emphasis added.)

81.     Two weeks later, on February 10, 2020, YayYo issued a press release entitled "YayYo, Inc. Announces Intention to Voluntarily Delist Its Common Stock From the NASDAQ Capital Market Effective February 20, 2020" disclosing that the new Board would delist YayYo common stock from the NASDAQ, stating:

YayYo, Inc. (NASDAQ: YAYO) (the "Company" or "YayYo") today *announced its intention to voluntarily delist its common stock from the NASDAQ Stock Market ("NASDAQ") effective on February 20, 2020*. The Company expects that its common stock will be approved for quotation on the OTCQB from and after that date. The Company has elected to effect the voluntary delisting of its common stock after discussions with NASDAQ's staff and based on the determination of the Company's board of directors that voluntarily delisting the common stock from the NASDAQ is in the best interests of the Company and its stockholders. *NASDAQ has advised the Company that it believes that the Company has failed the conditions for continued listing of its common stock set forth in Listing Rule 5250(a). The voluntary delisting will permit the Company to operate its business free from restrictions imposed by NASDAQ rules and the conditions applicable to the listing of the Company's common stock on the NASDAQ.*

The Company has notified NASDAQ of its intent to voluntarily delist its common stock from the NASDAQ. The Company currently anticipates that it will file with the Securities and Exchange Commission a Form 25 relating to the delisting of its common stock on or about February 20, 2020 and

25

expects the delisting of its common stock to be effective ten days thereafter. The purpose of the Form 25 filing is to effect the voluntary delisting from the NASDAQ of the Company's outstanding common stock. The Company does not expect the delisting to have any adverse effects on its business operations.

(Emphases added.)

Although El-Batrawi's official return was not announced at this point, this voluntary

delisting paved the way for it.

82.     While not fully explained in the YayYo press release, NASDAQ Rule

5250(a) set forth certain obligations for companies listed on the NASDAQ:

(1) NASDAQ may request any additional information or documentation, public or non-public, deemed necessary to make a determination regarding a Company's continued listing, including, but not limited to, any material provided to or received from the Commission or Other Regulatory Authority. A Company may be denied continued listing if it fails to provide such information within a reasonable period of time or if any communication to NASDAQ contains a material misrepresentation or omits material information necessary to make the communication to NASDAQ not misleading. The Company shall provide full and prompt responses to requests by NASDAQ or by FINRA acting on behalf of NASDAQ for information related to unusual market activity or to events that may have a material impact on trading of its securities in NASDAQ.

(2) As set forth in Rule 5625, a Company must provide NASDAQ with prompt notification after an Executive Officer of the Company becomes aware of any noncompliance by the Company with the requirements of the Rule 5600 Series.

83.     In other words, as El-Batrawi was forbidden for participating in the

Company, his constant meddling would have needed to be reported directly to NASDAQ.

### 2. The SRAX Action

84. On February 11, 2020, Social Reality, Inc. (which has since been renamed SRAX, and is referred to herein as "SRAX") filed a lawsuit against YayYo alleging breach of contract and unjust enrichment (the "SRAX Complaint"). The SRAX Complaint claimed that YayYo owed SRAX $645,286.

85. According to the SRAX Complaint, Defendant hired SRAX well before the IPO to develop on-line advertising and perform targeted social media. Defendant did not say it could not pay immediately, but that became clear. In discussions with YayYo, SRAX came to believe that YayYo would not be able to pay prior to the IPO. Therefore, SRAX entered into a temporary agreement in April 2019 where a third party purchased the debt. YayYo was to pay that third party. However, it did not, leaving SRAX to pay it or risk default, as the debt returned to SRAX if not paid by YayYo.

86. Therefore, according to the SRAX Complaint, YayYo owed it $426,286 in tasks that SRAX had presented invoices for and another $219,000 that it paid to the third party.

87. This $426,286 was all for tasks billed prior to the IPO, but notably the Registration Statement only stated the amount as due at year end 2018, $334,471. Therefore, the Registration Statement omitted $91,815.

88. Invoices for the services attached to the SRAX Complaint were signed by El-Batrawi.

27

89.     An email attached to the SRAX Complaint dated January 24, 2020 (the same day as the Company filed against El-Batrawi), and from Rosen, stated that the Company had paid SRAX $50,000 (presumably from the IPO proceeds) but YayYo would be unable to pay the rest of the outstanding bill until it obtained additional outside financing.

### 3.     The Davis Action

90.     Things did not get better for the Company.  On March 3, 2020, former YayYo President, CEO, and Director Davis filed a complaint for damages, declaratory relief, failure to pay wages in violation of labor code 201, et. seq., violation of California's Unfair Competition Laws (Business & Professions Code § 17200, *et seq*.), breach of contract, intentional misrepresentation and fraud, and promissory fraud against YayYo (the "Davis Complaint"), alleging in pertinent part:

> After only five (5) months of service and in accordance with his responsibilities under an employment agreement, Plaintiff determined that Ramy El-Batrawi could not be trusted because he regularly ignored legal counsel regarding SEC matters and flouted Board protocols and industry norms for corporate compliance. Specifically, El-Batrawi filed fraudulent and materially misleading documents with the SEC that Yayyo continues to use to deny Plaintiff the compensation he is owed.

> Instead of remaining in an untenable position due to El-Batrawi's illegal and fraudulent conduct, Plaintiff negotiated a separation written agreement through a consulting agreement that described the agreed upon compensation owed to Plaintiff, including specific language regarding payment from the stock options and other cash owed. To date, despite numerous good faith attempts to be paid pursuant to the written agreements, Yayyo refuses to honor its obligations thereunder.

* * *

28

Based on the written agreements, Yayyo and El-Batrawi caused damages to Davis in the amount of at least **$454,086.39** for losses related to cash compensation, expenses and the stock options value, plus attorney's fees and costs. Plaintiff also seeks injunctive relief requiring Yayyo to amend the SEC filings (Form S-1/A) so as to not mislead the public.

(Emphasis in original.)

91.    This was well beyond the $35,000 that the Registration Statement said the Company had committed to paying Davis.

92.    The Davis Complaint alleged that because the Company could not afford market rate for Davis' salary, the Company and Davis entered the following specific arrangements:

In lieu of a market-rate salary (i.e. about $300,000 to $500,000 or more per year in total compensation for Plaintiff), El-Batrawi induced Plaintiff to join Yayyo by promising him a written agreement that he would receive equity in the company worth up to "$800,000 each in options" or 100,000 shares at $8.00 per share which is referenced in his Offer Letter. Davis's Offer Letter is attached hereto as Exhibit A, and is incorporated by reference as if fully set forth herein. So long as Yayyo raised at least $5,000,000.00, it would compensate Plaintiff, at a minimum, in the form of cash for 25% of the $800,000.00 in equity promised under his Offer Letter in the form of "put options" that would provide cash liquidity at a closing event. Plaintiff is informed and believes that discovery will show that this $5,000,000.00 contingency amount was fulfilled in 2017. El-Batrawi guaranteed about $200,000.00 from the value of the stock options that could be cashed in at some point in the future. This promise was unrelated and not tied to the pricing of any public offering but was created as a Yayyo "put option" specifically for Plaintiff. These commitments by Yayyo and El-Batrawi were material inducements for Plaintiff to devote his time, leverage his relationships for Defendants' benefit, and use his track record and reputation to operate the business and put Yayyo in a more favorable position for the public offering.

29

93.     The Davis Complaint further made allegations against El-Batrawi about fabricated documents:

> Plaintiff is informed and believed and thereupon alleges that sometime in 2016, El- Batrawi drafted documents that contained equity/stock compensation terms that were never presented to the Board for consent or review. On December 23, 2016, El-Batrawi caused to be filed, under Davis' name and signature, and without his consent or knowledge, a document that contained the term Equity Incentive Plan (hereinafter the "Fabricated Equity Incentive Plan") that was purportedly adopted on November 29, 2016. This date was very same day Davis accepted the Davis' Offer Letter. No Board meeting was held on November 29, 2016 that addressed the Fabricated Equity Incentive Plan, or any incentive plan for that matter. El-Batrawi caused this document to be filed without the approval or knowledge of Yayyo's Board of Directors.

> Davis would never have agreed to this Fabricated Equity Incentive Plan, as the expiration period was significantly too short to allow for his options to be realized, rendering the compensation terms in their respective Offer Letters illusory.

> ***

> **The November 2016 Fabricated Equity Incentive Plan was never presented or adopted by the Board as represented in the filing with the SEC**, which makes it misleading to the public and creates conflict and liabilities for Yayyo as Plaintiff is informed and believes that El-Batrawi was acting in his own interest and not in that of the company.

94.     The Davis Complaint alleges that on March 15, 2017 the Company filed a document with the SEC containing the correct information regarding his stock and equity options, but then, subsequently, returned to referencing the fabricated November 2016 plan.

95.     The Davis Complaint further alleges that he notified the Company throughout 2018 and 2019 that it had filed false statements with the SEC:  "Throughout 2018 and

30

2019, without the assistance of legal counsel, written notice was provided to Yayyo's then CEO Laurie DiGiovanni and El-Batrawi that certain filings (*e.g.*, the Fabricated Equity Incentive Plan) with the SEC contained materially false statements, and that these false material statements, through Yayyo's current legal counsel, have been used to deny Plaintiff his compensation and stock options in Yayyo owed under his employment agreement. To date, Yayyo and its current counsel continue to file and maintain positions that deceive the public and deny Plaintiff the compensation he is owed."

96.    While the Registration Statement stated that Davis' options expired on December 31, 2018, and made no mention of other awards, the Davis Action stated he was in fact owed money related to stock options and other compensation.  The Davis Action sought "at least $454,086.39 for losses related to cash compensation, expenses and the stock options value, plus attorney's fees and costs."  It also sought "injunctive relief requiring YayYo to amend the SEC filings (Form S-1/A) so as to not mislead the public."

### 4.    The Company Undergoes More Changes and Needs More Funding

97.    Also on March 3, 2020, the Company, which was now trading over-the-counter, announced it had re-named El-Batrawi as CEO and a member of its Board, effective immediately.

98.    On March 5, 2020, the Company announced that Boyd Bishop resigned as President of the Company.

31

99.     On April 3, 2020, the Company announced that Defendant Pickard had also resigned from his positions as Director, Chief Financial Officer and Secretary of YayYo.

100.    On April 13, 2020, the Company announced that it would be in debt to El-Batrawi further.  A filing on a Form 8-K with the SEC stated:  "On April 2, 2020, X, LLC, a company wholly-owned and controlled by Ramy El-Batrawi, the Chief Executive Officer and a Director of YayYo, Inc. (the "Company"), loaned $50,000 to the Company, and on April 6, 2020, X, LLC, loaned an additional $100,000 to the Company. These loans were made under an oral agreement, are secured by all of the assets of the Company and its subsidiaries, bear no interest, and are payable 30 days after the date of the loan. The Company will use the proceeds of these loans for general working capital purposes."

101.    That same Form 8-K reported that ten days prior the Company had issued and sold 1,428,571 of its common stock to a private investor for gross proceeds of $100,000. The investor was not named.

**5.     The FirstFire Global Lawsuit**

102.    On April 28, 2020, FirstFire Global Opportunities Fund, LLC ("FirstFire") filed a complaint against underwriters for the IPO in the U.S. District Court for the Southern District of New York, Case No. l:20-cv-03327.  That Complaint has since been amended multiple times, with the Second Amended Complaint filed against YayYo, El-Batrawi, WestPark, Aegis, Richard A. Rappaport (head of WestPark), and Robert J. Eide (head of Aegis) (the "FirstFire Complaint").

32

103.   Among other things, the FirstFire Complaint alleges that the Registration Statement used to conduct the IPO was materially false and misleading because it concealed El-Batrawi's ongoing control over the company and its IPO process.

104.   FirstFire purports to be a subscriber in the Underwriter Defendants' distribution of shares of common stock as part of the IPO of YayYo.

105.   The FirstFire Complaint alleges that when the underwriters for the IPO were unable to raise the full $10 million required by NASDAQ to close the IPO, El-Batrawi fabricated a $1.2 million commitment purportedly from the Gray Mars Venus Trust, which was a shareholder.  According to the FirstFire Complaint:

> Upon information and belief and in or about the time of the Plaintiff's Indication and before the Offering was "closed," such Trust and investor never provided a genuine indication of interest and never intended to purchase $1.2 Million ($1,200,000.00) Dollars (U.S.) of YAYO's shares in the Initial Public Offering, nor intended to honor the "indication of interest."

106.   The FirstFire Complaint also alleges that Defendants solicited creditors and shareholders to invest more money to close the IPO, and "sought to sweeten the attraction of such further investment" by agreeing that YayYo would "immediately" pay them back from the IPO proceeds.

107.   The FirstFire Complaint alleges this "materially misrepresent[ed] the Offering and fraudulently mislead investors" because the Registration Statement specifically stated that the proceeds were to be used for legitimate purposes, such as to purchase vehicles and for general corporate purposes.

33

108. The FirstFire Complaint also alleges that the IPO did not properly "close" because the Gray Mars Venus Trust refused to follow through on its purported $1.2 million "indication of interest."

109. The FirstFire Complaint also alleges that the shares that were subject to the purported $1.2 million "indication of interest" were in fact sold to the open market.

110. The FirstFire Complaint references the 325,000 shares purportedly purchased by the Gray Mars Venus Trust, which were recorded in a filing with the SEC. According to the FirstFire Complaint, these were not paid for by the Gray Mars Venus Trust, but, rather, "the Company and/or WestPark covered the amounts involved in order to misrepresent to the public that the Offering had successfully closed."

111. As the FirstFire Complaint notes, and is recorded with the SEC, the Gray Mars Venus Trust sold 329,000 shares within a month of the Company going public. The stock dropped significantly during this period.

**E.     Other Developments Materially Impact the Company**

112. On March 31, 2020, the Company filed a Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K") which repeated many of the misstatements in the Registration Statement, including that El-Batrawi had sold 12,525,000 of his shares and resigned from the Company as a condition of listing on the NASDAQ. The 2019 10-K also downplayed the Company's obligation to SRAX.

113.   The 2019 10-K also included a chart detailing how the proceeds of the IPO were used:

| | |
|---|---|
| Repayment of notes payable and accrued interest | $   3,515,520 |
| Working capital | 2,793,962 |
| Director and officer insurance premiums and escrow account | 922,400 |
| Vehicles | 664,158 |
| Vehicle insurance | 622,323 |
| Professional fees | 534,363 |
| Advertising and media | 377,274 |

114.   Despite the Registration Statement stating the goal of the IPO was primarily to purchase vehicles, very little of the money went to the purchase of vehicles, only around 7% in fact.  The majority was used for the repayment of debt.

115.   On June 8, 2020, the Company again needed to raise money.  On a Form 8-K filed with the SEC, the Company reported it issued and sold another 1,000,000 shares of the Company's restricted common stock to a private investor for gross proceeds of $150,000.  The investor was again not named.

116.   On October 30, 2020, Defendants Miglino and Rosen filed a complaint in the Court of Chancery of the State of Delaware seeking advancement of legal fees with regard to civil proceedings (the "Advancement Complaint").   As part of the Advancement Complaint, Miglino and Rosen attached a rather shocking letter from Company counsel, dated September 16, 2020.  In the letter, Company counsel states:

> ***The company will absolutely not indemnify an officer for damages or harm caused by his misconduct, and as I indicated to you previously, we are***

35

***considering filing suit against Rosen seeking damages caused by his misconduct and his stark breach of fiduciary duty.*** Likewise, the company believes that Mr. Miglino' s bringing a meritless lawsuit against the company – by which he also breached a fiduciary duty of care to the corporation by engaging in commercial transactions with the corporation, while concurrently a board member -- is one of the reasons why the securities litigations have been filed. Read the complaints. Mr. Miglino's bogus claim against YayYo is explicitly referenced. So, YayYo has claims against Miglino as well.

In any event, your request for advance payment of attorney's fees is also premature. Although the Delaware Code section you cite authorizes the corporation, in its discretion, to "advance fees incurred by a corporate officer 'in advance of the final disposition' of a lawsuit against them" it is not required to do so. Moreover, you do not cite subsection (a) of Section 145 that expressly limits the ability of the corporation to indemnify an officer or director unless the corporation has a basis for believing that "the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation." That, sadly, is not the case. YayYo's position is that Messrs. Rosen and Miglino, as noted, acted in bad faith and contrary to the best interests of the corporation.

117.   The letter from the Company did not spell out what these breaches were other than referencing a lawsuit by Miglino, which was likely the SRAX Action. However, this letter is a statement of admission that the Company believes at least Rosen, CEO at the time of the IPO, committed misconduct.

118.   In November 2020, YayYo announced a name change to Rideshare Rental, Inc.

119.   On November 25, 2020, the Company filed a request for dismissal of the El-Batrawi Action.

120.   On January 12, 2021, John Gray, the principal of one of the Company's largest shareholders, the Gray Mars Venus Trust, Arizona 2015, announced that he had

36

agreed to extend a loan to the Company in the amount of $500,000, in return for which he will receive a convertible note issued by YayYo.

121.   A day later, YayYo announced that El-Batrawi, had increased his ownership position in YAYO common stock by five million (5,000,000) shares. El-Batrawi purportedly received these shares through an exchange transaction (valued at $3 a share for a total of $15,000,000) with RSR's largest stockholder, the Gray Mars Venus Trust, Arizona 2015. The shares were to be held as an asset of El-Batrawi's entity X, LLC. After the transaction, El-Batrawi reported owning approximately 26% of the Company. X, LLC is the same entity that supposedly sold its holdings prior to the IPO at the price of $3 a share.

122.   On February 4, 2021, YayYo announced that El-Batrawi would no longer be in charge. The Company issued a release that stated the following:

> Ramy El-Batrawi, acting through his holding company X, LLC, has entered into an agreement with Acuitas Group Holdings, LLC, in which, among other things, X, LLC will sell to Acuitas 6,000,000 shares of RSR common stock, which, in combination with its current holdings, will result in Acuitas becoming the Company's controlling stockholder (the "Agreement") with 10,055,512 shares.

> Also pursuant to the Agreement, which is subject to review and approval by the Company's Board of Directors (the "Board"), Mr. Terren Peizer, Acuitas' Sole Member will be nominated as Executive Chairman of the company. The Agreement also provides that current Board Chairman Mr. Stephen M. Sanchez will step down from that position in favor of Mr. Peizer but will be nominated to serve as the Company's Chief Executive Officer. Mr. Sanchez currently serves as Chief Executive Officer of PDQ Pickup LLC, a company engaged in the moving and logistics industry ("PDQ Pickup"). As part of the Agreement, XLLC will sell a portion of its minority stake in PDQ Pickup to Acuitas.

In addition, Mr. Peizer will immediately, focus, and work to affect an uplisting of RSR's common stock from the over-the-counter market ("OTC") to either the New York Stock Exchange or the NASDAQ Stock Market. Mr. Sanchez is expected to work closely with Mr. Peizer to achieve this goal.

**F.   Defendants Use Material Misstatements and Omissions in the Registration Statement to Sell YayYo Shares to Public Investors**

123.   On April 30, 2018, YayYo filed a registration statement with the SEC on Form S-1, which in combination with subsequent amendments on Forms S-1/A and filed pursuant to Rule 424(b)(4), are collectively referred to herein as the Registration Statement, which was issued in connection with the IPO.

124.   On November 14, 2019, YayYo filed a prospectus for the IPO of common stock on Form 424B4 (the "Prospectus") with the SEC, which forms part of the Registration Statement.[3]   In the IPO, YayYo sold 2,625,000 shares of its common stock at $4.00 per share, and the "[t]otal gross proceeds from the offering were $10,500,000[.]"

125.   The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

---

[3] On November 18, 2019, YayYo filed another prospectus on Form 424B4 with the SEC, which applies to a potential sale of shares by Bellridge Capital LLC.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERALS SECURITIES LAWS                    CASE NO.: 2:20-cv-08235-SVW-AFM

**1. Material Misstatements and Omissions Regarding Mr. El-Batrawi's Role and Stock Ownership**

126.   The Registration Statement stated the following, in pertinent part, regarding El-Batrawi's role with the Company:

> ***On October 4, 2018, Mr. El-Batrawi resigned as Chief Executive Officer.*** He then was appointed Acting Chief Executive Officer on November 17, 2018. ***On February 1, 2019, Mr. El-Batrawi resigned from his position as Acting Chief Executive Officer of the Company*** upon the appointment of Jonathan Rosen as Chief Executive Officer. ***Mr. El-Batrawi resigned as our director effective as of September 1, 2019.***

(Emphases added.)

127.   The Registration Statement claimed that Rosen was operating independently as CEO and stated, in pertinent part:

> We depend on a small number of executive officers and other members of management to work effectively as a team, to execute our business strategy and operating business segments, and to manage employees and consultants. ***Our success will be dependent on the personal efforts of our Chief Executive Officer, our directors and such other key personnel.*** Any of our officers or employees can terminate his or her employment relationship at any time, and the loss of the services of such individuals could have a material adverse effect on our business and prospects. ***Mr. El-Batrawi, the founder and original Chairman of the Board and original Chief Executive Officer of the Company from its incorporation of the Company, resigned from all positions with the Company as a condition for being approved for listing on The NASDAQ Capital Market.***

(Emphases added.)

128.   The Registration Statement stated the following, in pertinent part, regarding the purported sale of El-Batrawi's equity ownership:

39

***As a condition to approving the Company's common stock for listing on The NASDAQ Capital Market, X, LLC, an entity that is wholly-owned and controlled by Ramy El-Batrawi, our founder and former Chief Executive Officer and former director, agreed to sell 12,525,000 of its 15,425,000 shares of common stock. The 12,525,000 shares (the "Private Shares") were sold*** pursuant to an exemption from registration to four existing Company shareholders who qualify as accredited investors (as that term is defined in Securities Act Rule 501(a)). The Private Shares were sold at $3.00 per share in exchange for non-recourse, non-interest-bearing promissory notes with maturities ranging from one year to eighteen months. ***As a result of the sale, X, LLC's beneficial ownership shall be reduced to 9.9% of the shares outstanding after the completion of this Offering.*** We will not receive any proceeds from the sale of the Private Shares. If the offering contemplated by this registration statement is not consummated by January 31, 2020, the parties have agreed to unwind the sale of the Private Shares transaction in compliance with applicable law. Mr. El-Batrawi has also entered into a Voting Trust Agreement (the "Trust") pursuant to which the voting power of all of his remaining 2,900,000 shares of common stock will be controlled by a trustee who will use the voting power of the common stock held in the Trust to vote on all matters presented for a vote of stockholders in the same proportion that the shares of common stock not subject to the Trust voted on such matters.

* * *

***Mr. El-Batrawi has entered into a Voting Trust Agreement (the "Trust") pursuant to which the voting power of all of his outstanding common stock will be controlled by a trustee*** who will use the voting power of the common stock held in the Trust to vote on all matters presented for a vote of stockholders in the same proportion that the shares of common stock not subject to the Trust voted on such matters. The Trust shall be irrevocable, and shall terminate upon the earlier of (a) the written agreement of the Company, the trustee and a duly authorized representative of NASDAQ, or (b) the date upon which the Company is not listed on a security exchange controlled by NASDAQ.

* * *

**Voting Trust**

40

***Mr. El-Batrawi has entered into a Voting Trust Agreement pursuant to which the voting power of all of his outstanding common stock will be controlled by a trustee who will use the voting power of the common stock held in the Trust to vote on all matters, other than certain extraordinary matters***, presented for a vote of stockholders in the same proportion that the shares of common stock not subject to the Trust voted on such matters. Mr. El-Batrawi's entrance into the Voting Trust Agreement is a condition for the Company's approval for listing on The NASDAQ Capital Market.

***The Trust shall be irrevocable***, and shall terminate upon the earlier of (a) the written agreement of the Company, the trustee and a duly authorized representative of NASDAQ, or (b) the date upon which the Company is not listed on a security exchange controlled by NASDAQ.

***The trustee, initially one of our directors, Harbant S. Sidhu, shall have discretion to vote the Trust's shares on all extraordinary matters which shall include any merger, consolidation, business combination, share exchange, restructuring, recapitalization or acquisition involving the Company or any similar transaction or the sale, lease, exchange, pledge, mortgage or transfer of all or a material portion of the Company's assets.***

* * *

To the best of our knowledge, except as otherwise indicated, ***each of the persons named in the table has sole voting and investment power with respect to the shares of our common stock beneficially owned by such person***, except to the extent such power may be shared with a spouse. To our knowledge, none of the shares listed below are held under a voting trust or similar agreement, except as noted. ***To our knowledge, there is no arrangement, including any pledge by any person of securities of the Company, the operation of which may at a subsequent date result in a change in control of the Company.***

41

| Name and Address of Beneficial Owner | Title | Beneficially Owned | Percent of Class Before Offering | Percent of Class After Offering |
|---|---|---|---|---|
| **Officers and Directors** [1] | | | | |
| Jonathan Rosen | Chief Executive Officer | — | — | — |
| Kevin F. Pickard [2] | Chief Financial Officer and Director | 300,000 | 1.1% | 1.0% |
| Laurie DiGiovanni | Chief Operating Officer | — | — | — |
| | | | | |
| Jeffrey J. Guzy | Director | — | — | — |
| Christopher Miglino | Director | — | — | — |
| Harbant S. Sidhu | Director | — | — | — |
| Paul Richter | Director | — | — | — |
| | | | | |
| **Officers and Directors as a Group (total of 7 persons)** | | **300,000** | **1.1%** | **1.0%** |
| **5% Stockholders** | | | | |
| X, LLC [3] [5] | | 2,900,000 | 10.8% | 9.9% |
| Gray Mars Venus Trust, Arizona 2015 [4] [5] | | 10,325,000 | 38.5% | 35.1% |
| Bellridge Capital, L.P. [5] [6] | | 2,400,000 | 8.5% | 7.87% |
| David Haley [5] [7] | | 2,844,945 | 10.6% | 9.7% |
| James Malackowski [5] [8] | | 2,758,824 | 10.3% | 9.4% |
| John O'Hurley [5] [9] | | 2,018,750 | 7.5% | 6.9% |
| Acuitas Group Holdings, LLC [5] [10] | | 1,654,412 | 6.2% | 5.6% |

(Emphases added.)

129.    The Registration Statement did not disclose what the Rosen Declaration later stated – that El-Batrawi was still actively involved in the Company.

130.    The statements contained in ¶¶ 126-128 were materially false and misleading because the Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.  Specifically, the Registration Statement was false and/or misleading and/or failed to disclose that: (i) El-Batrawi continued to exercise

42

supervision, authority, and control over YayYo, and was intimately involved, on a day-to-day basis, with the business, operations, and finances of the Company, including purporting to bind the Company and attempting to supervise employees, as set forth in the Rosen Declaration; (ii) El-Batrawi had refused to sell his shares in the Company, as set forth in the Rosen Declaration; (iii) internal Company controls were so ineffective that they could not prevent El-Batrawi from continuing to play an active role in the Company; and (iv) the Company was violating NASDAQ rules by not reporting El-Batrawi's active involvement in the Company to NASDAQ.

### 2.     Material Misstatements and Omissions Regarding Internal Controls

131.   The Registration Statement stated: "At present, we believe that we have effective internal controls in place. However, our management, including our Chief Executive Officer, cannot guarantee that our internal controls and disclosure controls that we have in place will prevent all possible errors, mistakes or all fraud."

132.   The statements contained in ¶ 131 were materially false and misleading because the Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.  Specifically, the Registration Statement was false and/or misleading and/or failed to disclose that: (i) the internal controls were so ineffective that they could not prevent El-Batrawi from continuing to play an active role in the

Company; (ii) the internal controls were so ineffective that the Company failed to confirm that El-Batrawi had sold the shares necessary for listing on the NASDAQ; and (iii) the failure of these internal controls would lead to violation of NASDAQ rules and the delisting of the Company.

### 3.   Material Misstatements and Omissions Regarding Use of IPO Proceeds

133.   The Registration Statement stated the following, in pertinent part, regarding "Use of Proceeds'" from the IPO:

> We currently intend to use the net proceeds to us from this primary offering to purchase vehicles to add to our fleet of passenger vehicles made available for rent through our wholly-owned subsidiary, Distinct Cars, and for general corporate purposes, including working capital and sales and marketing activities.
>
> * * *
>
> The principal purposes of this primary offering are to increase our capitalization and financial flexibility, increase our visibility in the marketplace and create a public market for our common stock. As of the date of this prospectus, we cannot specify with certainty all of the particular uses for the net proceeds to us from this primary offering. However, we currently intend to use the net proceeds to us from this primary offering to add to our fleet of passenger vehicles made available for rent through the Company's wholly-owned subsidiary, Distinct Cars, and for general corporate purposes, including working capital, sales and marketing activities. We may also use a portion of the net proceeds for the acquisition of, or investment in, technologies, solutions or businesses that complement our business, although we have no present commitments or agreements to enter into any acquisitions or investments.

134.   A table included in the Registration Statement laid this out as follows:

44

| C | Amount |
|---|---|
| Purchase of Passenger Vehicles Made Available for Rent | $5,000,000 |
| Repayment of Notes Payable | 2,400,000 |
| Sales and Marketing | $   700,000 |
| Working Capital and General Corporate Purposes | $   693,800 |
| Total | $8,793,800 |

135.   However, according to the SRAX Action, the Company intended to use at least a portion of the proceeds to pay SRAX, and that was known prior to the IPO and not specifically disclosed in the Registration Statement.   Additionally, according to the FirstFire Action, the Company promised to payback early investors with those proceeds, another fact not disclosed in the Registration Statement.

136.   Additionally, the 2019 10-K later revealed that less than $650,000 of the proceeds from the IPO were used to purchase passenger vehicles.

137.   While the Registration Statement warned investors that it could not "specify with certainty all of the particular uses for the net proceeds to us from this primary offering" that was a mere boilerplate recitation, wholly inadequate given all the debt and obligations, including to SRAX and investors, the Company had at the time of the IPO.

138.   The statements contained in ¶¶ 133-136 were therefore materially false and misleading because the Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the

45

rules and regulations governing its preparation.   Specifically, the Registration Statement was false and/or misleading and/or failed to disclose that: (i) the Company had a bigger debt to SRAX than revealed, as alleged in the SRAX Action; (ii) the Company could not use $5,000,000 for purchase of vehicles because of all its other debt and requirements, as evidenced by it later using less than $650,000 for that purpose; and (ii) as alleged in the FirstFire Action, the Company had told pre-IPO investors that they would be paid back from proceeds from the IPO.

### 4.     Material Misstatements and Omissions Regarding the Debt to SRAX

139.   The Registration Statement stated the following, in pertinent part, regarding the Company's debt to Social Reality, Inc.:

> During the year ended December 31, 2018, the Company incurred $334,471 for advertising and digital media services from Social Reality, Inc. The advertising fees for the year ended December 31, 2018, were less than 5% of Social Reality, Inc.'s consolidated gross revenues. One of our directors, Christopher Miglino, is the Chief Executive Officer of Social Reality, Inc. and owns approximately 7.5% of Social Reality Inc.'s stock. ***At December 31, 2018, the Company had an amount due of $334,471 to Social Reality, Inc.*** The transactions with Social Reality, Inc. were arm's length transactions in the ordinary course of business upon terms no less favorable than the Company could obtain from third parties.

140.   The Registration Statement omitted the 2019 invoices received from SRAX for services rendered.

141.   The statements contained in ¶ 139 were therefore materially false and misleading because the Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to

46

make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.  Specifically, the Registration Statement was false and/or misleading and/or failed to disclose that, as alleged in the SRAX Action: (i) the Company owed SRAX $426,286 by the time of the IPO, a materially higher amount than disclosed; (ii) the Company had obtained services from SRAX with no ability to pay the relevant invoices; (iii) the Company was committed to pay a third party to which SRAX had sold the YayYo debt; and (iv) YayYo needed to use a portion of the IPO proceeds to pay its many debts.

**5.**    **Material Misstatements and Omissions Regarding Payment to Davis**

142.    The Registration Statement stated the following, in pertinent part, regarding Anthony Davis, its former President, CEO, and Director of YayYo:

- Anthony Davis was the "Former President, Chief Executive Officer, [and] Director[,]" having served in those capacities between 2017 and 2018 and was paid $20,000 in salary;

- "On December 1, 2016 . . . Mr. Davis . . . received nonqualified stock options expiring on December 31, 2018, entitling [him] to purchase 100.000 shares of Company common stock at an exercise price of $1.00 per share at any time on or after June 1, 2017"; and

- "On November 29, 2016, the Company and Mr. Davis, a former executive officer of the Company, entered into an offer of employment agreement with the Company setting forth an initial base salary for Mr. Davis's first three months of service and performance under his term of employment with the Company. As set forth under the employment offer, Mr. Davis was entitled to receive (i) $15,000 for his service in the month of December 2016, (ii) $10,000 for service performed during the month of January, 2017 and an additional $10,000 for service performed by Mr. Davis during the month of February 2017."

- "On December 1, 2016, each of Mr. Davis and Mr. Vanech received non-

47

qualified stock options expiring on December 31, 2018, entitling them to purchase 100,000 shares of Company common stock at an exercise price of $1.00 per share at any time on or after June 1, 2017."

143. The statements contained in ¶ 142 were therefore materially false and misleading because the Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation. Specifically, the Registration Statement was false and/or misleading and/or failed to disclose that, as alleged in the Davis Action: (i) YayYo owed its former President, CEO, and Director over four-hundred-and-fifty thousand dollars at the time of the IPO; (ii) Davis was owed money as a result of his promised stock options; and (iii) YayYo filed a materially false statement regarding the agreement with Davis, as the Davis Action alleges the incentive plan filed with the SEC was never agreed to by him or presented to the YayYo board.

## 6. The Registration Statement Failed to Disclose Trends, Uncertainties and Risks Regarding YayYo's Products

144. Moreover, the Registration Statement failed to disclose trends, uncertainties and risks regarding preferred and card loans.

145. Part I of Form F-1, which YayYo filed with the SEC as part of the IPO process, is entitled "Information Required in Prospectus" and it governs the nature and content of information an issuer must disclose in connection with an offering.

48

146.   Item 5 of Part I of Form 20-F, entitled "Operating and Financial Review and Prospects," requires an issuer to disclose "management's assessment of factors and trends which are anticipated to have a material effect on the company's financial condition and results of operations in future periods."   Specifically, Item 5(D), entitled "Trend information," provides, in full, as follows:

> The company should identify the most significant recent trends in production, sales and inventory, the state of the order book and costs and selling prices since the latest financial year. The company also should discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.

147.   The scope of the information whose disclosure is required under this paragraph on trends, uncertainties and events is coextensive with that required under Item 303(a)(3)(ii) of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), which requires an issuer to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

148.   Accordingly, Item 303 of Regulation S-K imposed an affirmative obligation on YayYo to disclose information about known trends and uncertainties, including the potential delisting due to El-Batrawi's continued involvement with the Company. Defendants violated Item 303.  For example, Defendants knew, but did not disclose, that

49

(i) El-Batrawi was continuing to involve himself in the Company's affairs and represent himself as in charge of Yayo, leading to potential problems with the Company's NASDAQ listing; (ii) El-Batrawi had not sold his shares as purported in the Prospectus; (iii) the Company's insufficient internal controls would lead to inquiries from NASDAQ and the Company's eventual delisting; (iv) the Company had committed to paying back investors who invested so the Offering could close; and (v) the Company owed more money than it disclosed and was not able to pay.

149. Moreover, Item 303 required disclosure of these trends and uncertainties because they could cause YayYo's reported financial information in the Offering Materials to not necessarily to be indicative of the Company's future operating results or financial condition.

150. Similarly to Item 103, Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105, requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky" and requires each risk factor to "adequately describe the risk."

151. YayYo's failure to disclose internal data and decisions violated 17 C.F.R. § 229.105 because these adverse trends created significant risks that were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in YayYo speculative or risky. Indeed, the risk factors that were

provided in the Registration Statement were themselves materially misleading because they provided generic statements of potential or contingent risk yet failed to disclose that the potential future adverse impacts described were already occurring.  For example, the Registration Statement purported to warn that "We depend on a small number of executive officers and other members of management to work effectively as a team, to execute our business strategy and operating business segments, and to manage employees and consultants. Our success will be dependent on the personal efforts of our Chief Executive Officer, our directors and such other key personnel. . . . Mr. El-Batrawi, the founder and original Chairman of the Board and original Chief Executive Officer of the Company from its incorporation of the Company, resigned from all positions with the Company as a condition for being approved for listing on The NASDAQ Capital Market. Our management team has only worked together for only a very short period of time and may not work well together as a management team."  This statement was made while Mr. El-Batrawi was still involved in the Company's affairs and behaving as if he was part of the management team of the Company.

## SECURITIES ACT COUNTS

152.   For the purposes of the claims alleged in this section, it is as though Section VIII is not part of this Complaint.  As stated herein, the allegations in this Section arise under district liability and/or negligence, and none of the allegations herein shall be

interpreted as alleging intentional or reckless misconduct or alleging that any of the Defendants acted with scienter or fraudulent intent.

## V.    COUNT I

### (Violations of Section 11 of the Securities Act Against All Defendants)

153.   Plaintiffs repeat and reallege allegations in Paragraphs 1-152 above.  This claim does not allege fraud, recklessness, or intentional misconduct.

154.   This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.

155.   The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

156.   Defendants are strictly liable to Plaintiffs and the Class for the misstatements and omissions.

157.   None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.  Defendants were therefore negligent.

158.   By reason of the conduct herein alleged, each Defendant violated or controlled a person who violated Section 11 of the Securities Act.

159.   Plaintiffs acquired the Company's common stock pursuant to the Registration Statement.

160.   At the time of their purchases of YayYo common stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

161.   This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering.  This claim is therefore timely.

## VI.   COUNT II

### (Violations of Section 12(a)(2) of the Securities Act Against the Underwriter Defendants)

162.   Plaintiff Koch repeats and reallege allegations in Paragraphs 1-161.  This claim is premised on the remedies available under Section 12 of the Securities Act, and does not assert that Defendants acted with fraudulent intent.

163.   This claim is asserted by Plaintiff Koch against the Underwriter Defendants, on behalf of all persons who acquired shares of the Company's common stock pursuant to the November 13, 2019 IPO.

164.   Plaintiff Koch acquired his shares from WestPark as part of the IPO.

53

165.   By means of the Registration Statement, each of the Underwriter Defendants offered, promoted, and sold YayYo shares in the IPO, and therefore was liable under Section 12(a)(2) for the misrepresentations and omissions contained in the Registration Statement.

166.   WestPark and Aegis sold 2,625,500 YayYo shares (excluding the overallotment).

167.   The Underwriter Defendants solicited the purchase of YayYo shares, motivated by a desire to serve their own financial interests or those of the securities owner. The Underwriter Defendants made significant commissions on these sales.   The underwriting discounts and commissions represented 8% if the IPO price.

168.   None of the Underwriter Defendants named herein conducted a reasonable investigation or possessed a reasonable basis for the belief that the statements contained in the Registration Statement, and identified in Paragraphs 126-151 above were true, were without omissions of material fact, and were not misleading.

169.   By reason of the conduct alleged herein, each of the Underwriter Defendants has violated Section 12(a)(2) of the Securities Act.

170.   Plaintiffs and the Classes have sustained enormous damages because the value of their YayYo shares has declined precipitously.

171.   Plaintiffs and the Classes hereby tender their shares to the Underwriter Defendants and demand rescission.

54

172.   At the time of their purchases, Plaintiffs and the Classes were without knowledge of the wrongful conduct alleged herein, and could not have reasonably discovered those facts more than one year prior to the filing of the initial complaint in this action. The initial complaint was filed within three years of the time that the Underwriter Defendants first sold YayYo shares to the investing public.

## VII.   COUNT III

**(Violations of Section 15 of the Securities Act Against All Defendants)**

173.   Plaintiffs repeat and reallege allegations in Paragraphs 1-172 above.   This claim is premised on the remedies available under Section 15 of the Securities Act, and does not assert that Defendants acted with fraudulent intent.

174.   This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o against all Defendants.

175.   The Individual Defendants were controlling persons of YayYo by virtue of their positions as directors and/or senior officers of the Company.   The Individual Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and major shareholders of the Company.   The Company controlled the Individual Defendants and all of YayYo employees.

176.   The Underwriter Defendants also controlled the statements made in the Registration Statement and had an active role in the IPO.

177.   Defendants were culpable participants in the violations of Section 11 of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

178.   This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering.  This claim is therefore timely.

## VIII.   ADDITIONAL ALLEGATIONS APPLICABLE ONLY TO EXCHANGE ACT CLAIMS

179.   Plaintiffs make the additional allegations contained in ¶¶ 180-210 below with respect to their claims under Section 10(b) and 20(a) of the Exchange Act only.  Plaintiffs disclaim any reliance upon these allegations or incorporation of these allegations in their Securities Act claims.

180.   Plaintiffs, who purchased or otherwise acquired YayYo during the Exchange Act Class Period, bring these claims on behalf of the Exchange Act Class against YayYo and the Individual Defendants only.

181.   YayYo and each of the Individual Defendants are makers of the statements contained in the Registration Statement because YayYo is the Issuer of the statements and each of the Individual Defendants signed his name to those statements, indicating that he

56

was a maker thereof, or was actively involved in the supervision of the Registration Statement.

## A.     Additional Misrepresentations and Omissions

182.   YayYo did not disclose the truth to investors – the truth came out only through a series of lawsuits.

183.   On November 15, 2019, the Company released the November Closing Release, which stated:

> YayYo, Inc. ("YayYo")(NASDAQ:YAYO), a leading provider of vehicles to the rideshare industry, through its wholly-owned subsidiary, Rideshare Car Rentals, LLC, bridging the gap between rideshare drivers needing a quality vehicle and rideshare companies that depend on attracting and keeping drivers with quality vehicles, today announced that it closed its initial public offering of 2,625,000 common shares at $4.00 per share. Total gross proceeds from the offering were $10,500,000, before deducting underwriting discounts and commissions and other offering expenses. The shares are listed on the NASDAQ Capital Market under the symbol "YAYO".
>
> Aegis Capital Corp. and WestPark Capital, Inc. served as joint book running managers.
>
> The shares were offered pursuant to a registration statement declared effective by the Securities and Exchange Commission (the "SEC") on November 12, 2019.

184.   The statements in ¶ 183 were materially false and misleading when made because, as alleged in the FirstFire Action: (i) the Company falsified an indication of interest of 1.2 million dollars from the Gray Mars Venus Trust; (ii) YayYo promised to pay investors in the Offering back with monies raised in the IPO; and (iii) "the Company and/or WestPark covered the amounts involved" in the Gray Mars Venus Trust purported

purchase of 325,000 shares in order to misrepresent to the public that the Offering had successfully closed.

185.   Many of the misstatements from the Registration Statement were repeated in the Company's Form 2019 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K"), filed with the SEC on March 31, 2020.  The 2019 10-K was signed by Defendants El-Batrawi, Sidhu and Pickard among others.

186.   Like the Registration Statement, the 2019 10-K also maintained that El-Batrawi stepped down from his positions at the Company, stating in relevant part:

> **On October 4, 2018, Mr. El-Batrawi resigned as Chief Executive Officer. He then was appointed Acting Chief Executive Officer on November 17, 2018. On February 1, 2019, Mr. El-Batrawi resigned from his position as Acting Chief Executive Officer of the Company upon the appointment of Jonathan Rosen as Chief Executive Officer. In addition, Mr. El-Batrawi resigned as our director effective as of September 1, 2019.** Mr. El-Batrawi was reappointed as our Chief Executive Officer and a director in February 2020.

(Emphasis added.)

187.   The 2019 10-K also described YayYo's risk factors pertaining to its management team, stating:

> **Ramy El-Batrawi, our founder and original Chairman of the Board and original Chief Executive Officer of the Company from its incorporation of the Company, resigned from all positions with the Company as a condition for being approved for listing on The NASDAQ Capital Market.** After our delisting from NASDAQ, Mr. El-Batrawi was reappointed as our Chief Executive Officer and a director, and our former Chief Executive Officer, Jonathan Rosen, and our former President, Boyd Bishop, resigned. Our management team has only worked together for only a very short period of time and may not work well together as a management team.

58

(Emphasis added.)

188.   Notably, this paragraph made it seem like Rosen had resigned after delisting, which was false according to the Company's own filings.

189.   Regarding El-Batrawi's equity ownership and control of the Company, the 2019 10-K stated:

> As a condition to approving the Company's common stock for listing on The NASDAQ Capital Market, X, LLC, agreed to sell 12,525,000 of its 15,425,000 shares of the Company's common stock. The 12,525,000 shares (the "Private Shares") were sold pursuant to an exemption from registration under the Securities Act to four existing Company shareholders who qualify as accredited investors (as that term is defined in Securities Act Rule 501(a)). The Private Shares were sold at $3.00 per share in exchange for non-recourse, non-interest-bearing promissory notes with maturities ranging from one year to eighteen months. X, LLC transferred all rights of ownership to the purchasers. The purchasers shall be entitled to receive all dividends and distributions, shall have the power to exercise all voting rights and may sell or pledge the Private Shares. The Private Shares, however, shall not be electronically transferred to the purchasers' account until the pricing of this public offering.

* * *

> As a condition to our listing on NASDAQ,(i) Ramy El-Batrawi, our founder and original Chairman of the Board and original Chief Executive Officer, resigned from all positions with the Company, (ii) X, LLC, an entity that is wholly-owned and controlled by Mr. El-Batrawi, agreed to sell 12,525,000 of its 15,425,000 shares of common stock, reducing, X, LLC's beneficial ownership to 9.9% of our common stock then outstanding, and (iii) Mr. El-Batrawi entered into a Voting Trust Agreement (the "Trust") pursuant to which the voting power of all of his outstanding common stock was controlled by a trustee who was required to use the voting power of the common stock held in the Trust to vote on all matters presented for a vote of stockholders in the same proportion that the shares of common stock not subject to the Trust voted on such matters.

* * *

59

> Mr. El-Batrawi has entered into a Voting Trust Agreement (the "Trust") pursuant to which the voting power of all of his outstanding common stock will be controlled by a trustee who will use the voting power of the common stock held in the Trust to vote on all matters presented for a vote of stockholders in the same proportion that the shares of common stock not subject to the Trust voted on such matters.

190.   Like the Registration Statement, the 2019 10-K understated the debt YayYo owed to SRAX, continuing to report the 2018 figures, not the 2019 figures, stating the following:

> During the year ended December 31, 2018, the Company incurred $334,471 for advertising and digital media services from Social Reality, Inc. The advertising fees for the year ended December 31, 2018, were less than 5% of Social Reality, Inc.'s consolidated gross revenues. One of our former directors, Christopher Miglino, is the Chief Executive Officer of Social Reality, Inc. and owns approximately 7.5% of Social Reality Inc.'s stock. At December 31, 2018, the Company had an amount due of $334,471 to Social Reality, Inc. The transactions with Social Reality, Inc. were arm's length transactions in the ordinary course of business upon terms no less favorable than the Company could obtain from third parties.

191.   The statements referenced above in ¶¶ 185-190 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) in violation of the listing conditions imposed by the NASDAQ, El-Batrawi never ceased controlling YayYo; (2) in further violation of the listing conditions imposed by the NASDAQ, El-Batrawi did not divest himself of the 12,525,000 shares he owned, and continued to hold a controlling interest in the Company; and (3) the Company owed SRAX approximately $426,286 in unpaid services, more than the amount they owed in 2018 and most of which was now over a year past due.

60

**B.  Scienter**

192.  Additional aspects of the Individual Defendants' conduct indicate that they either deliberately, recklessly or intentionally made the most significant misrepresentations and omissions contained in the Registration Statement and later statements:

a.  El-Batrawi was continuing to play an active role at YayYo and assert himself as being in charge of the Company;

b.  El-Batrawi had not sold his shares as required for the Company's NASDAQ listing;

c.  The Individual Defendants knew the Company did not have sufficient internal controls;

d.  The Company was not able to pay its debts;

e.  Proceeds from the IPO would not be used to purchase vehicles but instead pay back investors;

f.  The Company owed more money to SRAX than disclosed; and

g.  The Company owed more money to Davis than disclosed.

193.  The Individual Defendants were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Exchange Act Class Period. The Individual Defendants had access to and were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other

61

statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

194. As senior officers and controlling persons of a publicly-held company whose shares were, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ and later the over-the-counter market, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to YayYo's operations and business, and to correct any previously issued statements that were materially misleading or untrue when made, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' wrongful conduct during the Exchange Act Class Period as described herein violated these specific requirements and obligations.

195. For example, Rosen admitted in the Rosen Declaration that El-Batrawi had never stepped back from the Company, even though such resignation was a condition for the Company's NASDAQ listing.

## C. Loss Causation

196. YayYo had an IPO price of $4 but suffered as the truth came out about the reality of its business.

197. The stock quickly decreased, attributable at least in part to the delisting and the revelations in various lawsuits.

198.   For example, on February 10, 2020, YayYo closed at $1.07.  It announced following the close of the market that it would "voluntarily delist" from NASDAQ.  The following day, a day in which SRAX also filed the initial complaint in its lawsuit, YayYo stock was down a material 64% from the prior day.

199.   YayYo's stock last closed at $0.285 per share on September 18, 2020, the filing of the original complaint in this action representing a 92.88% decline from the price the stock was offered at in the IPO.

## D.    Presumption of Reliance

200.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.    YayYo and the Individual Defendants made public misrepresentations or failed to disclose material facts during the Exchange Act Class Period;

b.    the omissions and misrepresentations were material;

c.    YayYo shares are traded in an efficient market;

d.    the Company's shares were liquid and traded with moderate to heavy volume during the Exchange Act Class Period;

e.    the Company traded on the NASDAQ  at the start of the Class Period and was covered by multiple analysts;

f.    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's shares; and

g.    Plaintiffs and members of the Exchange Act Class purchased, acquired and/or sold YayYo between the time YayYo and the Individual Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

63

201.   Based upon the foregoing, Plaintiffs and the members of the Exchange Act Class are entitled to a presumption of reliance upon the integrity of the market.

202.   Alternatively, Plaintiffs and the members of the Exchange Act Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as YayYo and the Individual Defendants omitted material information in their statements during the Exchange Act Class Period in violation of a duty to disclose such information, as detailed herein.

## EXCHANGE ACT COUNTS

### IX.   <u>COUNT III</u>

### (Violations of § 10(b) of the Exchange Act Against the Individual Defendants and YayYo)

203.   Plaintiffs repeat and reallege allegations in Paragraphs 1-151 and 180-202 above.

204.   During the Exchange Act Class Period, YayYo and the Individual Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

205.   YayYo and the Individual Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's shares during the Exchange Act Class Period.

206.   Plaintiffs and the Exchange Act Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for YayYo shares.  Plaintiffs and the Exchange Act Class would not have purchased YayYo shares at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by YayYo and the Individual Defendants' misleading statements.

207.   As a direct and proximate result of YayYo and the Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Exchange Act Class suffered damages in connection with their purchases of YayYo shares during the Exchange Act Class Period.

## X.   <u>COUNT IV</u>

**(Violations of § 20(a) of the Exchange Act Against the Individual Defendants)**

208.   Plaintiffs repeat and reallege allegations in Paragraphs 1-151 and 180-207 above.  The Individual Defendants acted as controlling persons of YayYo within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions as officers

65

and/or directors of YayYo, and/or their ownership of YayYo securities, the Individual Defendants had the power and authority to, and did, cause YayYo to engage in the wrongful conduct alleged.

209.   As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Exchange Act Class suffered damages in connection with their purchases of YayYo shares during the Exchange Act Class Period.

210.   By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XI.       PLAINTIFFS' CLASS ACTION ALLEGATIONS

211.   Plaintiffs bring this action as a class action on behalf of the Classes.  Excluded from the Classes are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

212.   The members of the Classes are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members in the proposed Classes.  Record owners and other members of the Classes may be identified from records maintained by the Company or its

66

transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

213.    Plaintiffs' claims are typical of the claims of the members of the Classes, as all members of the Classes are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

214.    Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel competent and experienced in class and securities litigation.

215.    Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes. Among the questions of law and fact common to the Classes are:

(a)    whether Defendants violated the Securities Act;

(b)    whether Defendants violated the Exchange Act;

(c)    whether the Company's statements contained false or misleading statements of material fact and omitted material information required to be stated therein; and

(d)    to what extent the members of the Classes have sustained damages and the proper measure of damages.

216.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively

small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.      PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.      Awarding compensatory damages in favor of Plaintiffs and the other members of the two classes against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the other members of the Classes their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative members of the Classes to exclude themselves by requesting exclusion through noticed procedures.

## XIII.    JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  February 8, 2021

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
Facsimile: (917) 463-1044
jpafiti@pomlaw.com

Jeremy A. Lieberman (*pro hac vice* forthcoming)
Cara David (*pro hac vice* forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: cdavid@pomlaw.com

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein (*pro hac vice* forthcoming)
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

***Attorneys for Plaintiffs***

69